Filed 10/19/20  P. v. Atilano CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br> MATTHEW ANTHONY ATILANO,<br><br>  Defendant and Appellant. | G057738<br><br>(Super. Ct. No. FSB1004965-2)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of San Bernardino County, Dwight W. Moore, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

*          *          *

INTRODUCTION

Defendant Matthew Anthony Atilano was convicted by a jury of first degree murder and possession of a firearm by a felon. The jury also found true gang and firearm sentencing enhancement allegations. In our prior opinion, *People v. Atilano* (Feb. 26, 2015, G050427) (nonpub. opn.) (*Atilano I*), we affirmed the judgment of conviction, but remanded to the trial court to determine whether Atilano was entitled to a *Marsden*[1] or *Faretta*[2] hearing for the limited purpose of Atilano possibly filing a motion for a new trial.

Following remand, Atilano retained private counsel and filed a motion for a new trial, which the trial court denied. Atilano contends his trial counsel rendered ineffective assistance by failing to present expert witness testimony regarding Atilano's voluntary intoxication at the time of the shooting and that the trial court should have ordered a new trial on that basis.

We conclude the trial court did not abuse its discretion by denying the motion for a new trial and therefore affirm. The record shows Atilano's primary defense at trial was that the victim was shot accidentally following a struggle for control of Atilano's gun. That primary defense was based on Atilano's trial testimony. Atilano's trial counsel, therefore, had a rational tactical reason for jettisoning a voluntary intoxication defense that might undermine the credibility of Atilano's trial testimony describing an accidental shooting.

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[2] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

2

FACTS

The following facts are taken from our prior opinion:

"On November 27, 2010, a group of Jose Vincent Castro's friends and family, including his cousin, Victor Greene, and friend, Gerard Mitchell, gathered at a bar in San Bernardino to celebrate Castro's birthday. Atilano and his friends, who are Hispanic, were also at the bar that night. Atilano was a member of the Sir Crazy Ones clique of the West Side Verdugo gang in the City of San Bernardino. Castro and Greene are African-American. There had been tension between members of West Side Verdugo and African-American individuals in the area.

"A car, carrying 13-year-old K.C., her 16-year-old sister, G.U., G.'s boyfriend, Mark, and Mark's friend, stopped near the bar; the car was low on gas. K. went to the patio of the bar to ask someone for money to buy gas. Castro's friend, "Tick," told her he would give her money for sex. Atilano was also on the patio and reacted to Tick's comment. Castro saw there was trouble between Tick and Atilano; Castro had observed Atilano and his group engage in disturbances at the bar that evening. Castro went to the patio to calm things down. Atilano told Castro that he and Tick were okay and they got along after that. Atilano's stepfather, Carmelino Filippini, offered to buy Castro and his mother a drink.

"Atilano told K. he would give her money for gas if she showed him the car she claimed was low on gas. They walked into the parking lot. As they were walking, Greene, who had left the party a few minutes earlier, started to back up the car he was driving; he apparently did not see Atilano and K. walking nearby.

"K. testified that she saw Atilano kick the back bumper of Greene's car and heard him start yelling. Greene got out of the car and it looked to K. as though Greene and Atilano were going to fight. She saw Atilano remove a gun from his waistband, and point it down and then toward Greene. K. thought she heard three or four shots altogether.

3

"G. was in the parking lot waiting for K. to return when K. and Atilano walked out of the bar and through the parking lot. G. told the police that she too had seen Greene start to back up his car and get close to hitting K. and Atilano; she thought Greene must not have seen them. G. told the police that Atilano got angry, kicked the back of the car, went up to Greene's front window and banged on it, and told Greene to open the car door. After Greene opened the car door, Atilano pulled out a gun, put it to Greene's head, and started yelling at him. Atilano pulled Greene out of the car, and Greene put his hands up. G. heard Atilano fire the gun twice before she saw Greene fall to the ground. She saw that Greene tried to pull himself to get inside the car; Atilano kicked him and then shot him.

"Castro had left the bar and was in the parking lot retrieving something out of his truck when he heard a gunshot. He ducked behind a car and saw 'someone on the ground' who he later found out was Greene. Castro stated that after Atilano walked away toward his right, Atilano turned around, walked back to Greene who was lying on the ground, stood over him, and shot him. Castro then saw Atilano walk away.

"Filippini and others from inside the bar came outside. When Atilano reappeared in the parking lot, without the hat or jacket he had been wearing, Filippini told Atilano to leave, 'get out of here; go, go, go.' Atilano drove away.

"Mitchell too had been walking in the parking lot when he noticed Atilano and Greene arguing. Mitchell heard a gunshot and saw Greene fall; he did not know whether Greene had been shot or not. Mitchell saw Atilano walk away, but then turn around, walk up to Greene, push him down (Greene's hand was attempting to fight Atilano off), and shoot him in the head pointblank, less than two inches away.

"An autopsy established Greene died from a single gunshot wound to the head, which was fired at close range, that could 'easily have been a couple of inches' away but likely four to six inches away. Greene had also suffered six or seven blows to his head and had abrasions on his right forearm, left elbow, and left knee.

4

"Atilano testified in his defense.  He testified that he is a member of the Sir Crazy Ones clique of the West Side Verdugo gang.  He brought a gun with him to the bar because San Bernardino is a dangerous city 'because of guys like [himself].'

"While at the bar, Atilano heard an African-American man make a comment to a girl that he would give her money for sex.  Atilano told the man that she was a minor.  The man agreed with Atilano that he had done wrong, and he and Atilano got along after that exchange.

"Atilano testified he told the girl that he would give her money but needed to confirm that she was telling the truth about running out of gas.  While in the parking lot with the girl, he saw Greene talking to the girl's sister.  He confronted Greene by telling him that she was a minor.  Greene challenged Atilano 'like . . . it wasn't any of [his] business.'  Atilano and Greene started to fight.  Atilano landed a couple of punches before pulling out a revolver.  He pistol-whipped Greene across the face.  He testified that Greene reached for the gun and they fell to the ground, wrestling each other for control of it.  Atilano said the gun accidentally discharged during the struggle, striking Greene." (*Atilano I, supra*, G050427, fns. omitted.)


PROCEDURAL HISTORY

A jury found Atilano guilty of murder (Pen. Code, § 187, subd. (a)),[3] and of possession of a firearm by a felon (§ 12021, subd. (a)(1)).  As to the murder offense, the jury found true the sentencing enhancement allegations Atilano personally and intentionally discharged a firearm, causing great bodily injury and death to Greene (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally used a firearm (§§ 12022.53, subd. (b), 1203.06, subd. (a)(1), 12022.5, subd. (a)).  The jury found true the sentencing enhancement allegation that the

---

[3]  All further statutory references are to the Penal Code.

murder offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)), and that the possession of a firearm by a felon offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (*ibid.*). Atilano admitted he had suffered a prior conviction of a serious or violent felony or juvenile adjudication.

Atilano was sentenced to a total prison term of 75 years to life plus a five-year consecutive term.

In *Atilano I, supra*, G050427, we affirmed the judgment of conviction, but remanded with directions that the trial court determine whether Atilano was entitled to a *Marsden* or *Faretta* hearing for the limited purpose of Atilano possibly filing a motion for a new trial. At the sentencing hearing, Atilano had made a statement to the court that suggested his desire either to obtain new counsel or to represent himself to file a motion for a new trial; Atilano's trial counsel stated that he could find no grounds for such a motion.

Following remand, Atilano retained private counsel and in October 2017, filed a motion for a new trial in which he argued his trial counsel was ineffective for failing to call an expert regarding the diminished capacity defense based on voluntary intoxication. The trial court denied the motion for a new trial. Atilano appealed.

DISCUSSION

I.

GOVERNING LEGAL PRINCIPLES AND STANDARD OF REVIEW

In *People v. Hoyt* (2020) 8 Cal.5th 892, 958 (*Hoyt*), the California Supreme Court explained: "Usually, 'ineffective assistance [of counsel claims are] more appropriately decided in a habeas corpus proceeding.' [Citation.] But we have also held

6

that a defendant may raise the issue of counsel's effectiveness as a basis for a new trial, and, to expedite justice, a trial court should rule '[i]f the court is able to determine the effectiveness issue on such motion.' [Citation.] To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' [Citation.] To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.'"

We apply the deferential abuse-of-discretion standard in our review of the trial court's ruling on the motion for a new trial and "'"'"will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.'"'"'" (*Hoyt, supra,* 8 Cal.5th at p. 958.)

## II.

### MURDER, MANSLAUGHTER, AND THE DEFENSE OF VOLUNTARY INTOXICATION

Murder is an unlawful killing with express or implied malice. (§§ 187, subd. (a), 188; *People v. Soto* (2018) 4 Cal.5th 968, 974 (*Soto*).) Express malice requires a "a deliberate intention to unlawfully take away the life of a fellow creature" and malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(1), (2).)

"Voluntary '[m]anslaughter, a lesser included offense of murder, is an unlawful killing without malice. . . . Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable

7

self-defense.' [Citations.] [¶] 'Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime. [Citations.] A killing committed when that belief is *unreasonable* is not justifiable. Nevertheless, "one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter."'" (*Soto, supra*, 4 Cal.5th at p. 974.)

Section 29.4 provides that evidence of voluntary intoxication is not admissible to "negate the capacity to form" a mental state for a charged crime (§ 29.4, subd. (a)), but such evidence is admissible on the issue of whether the defendant "actually formed" certain mental states (*id.*, subd. (b)). "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (*Id.*, subd. (b).) "Because harbored *implied* malice does not appear in this enumerated list, section 29.4 prohibits the use of evidence of voluntary intoxication to establish that a defendant acted without implied malice." (*Soto, supra*, 4 Cal.5th at p. 975.) Further, under section 29.4, evidence of voluntary intoxication, while admissible on the question whether a defendant actually intended to kill (required to show express malice), is not admissible on the question whether the defendant believed it necessary to act in self-defense (a belief that, as discussed *ante*, can preclude the formation of express or implied malice). (*Soto, supra*, 4 Cal.5th at p. 970.)

## III.

### ATILANO'S MOTION FOR A NEW TRIAL, THE PROSECUTION'S OPPOSITION, AND THE HEARING

### A.

### *Atilano's Voluntary Intoxication Argument*

In his motion for a new trial, Atilano's argument that his trial counsel was ineffective for having failed to pursue the diminished capacity defense at trial stated as follows in its entirety: "[T]estimony elicited from the prosecutor and the defendant's trial attorney, had the defendant intoxicated. The prosecution asked the defendant about his drinking pattern that night and whether he knew what was going on because he was drunk and he stated 'no'. [Citation.] The defendant's trial attorney also elicited this information on direct examination of the defendant, [citation]. Additionally the defendant's trial attorney and defendant discussed the defense of diminished capacity [citation], but the defendant's trial attorney told him it was 'too late' to hire an expert and 'besides you will have to pay for it and I know you have no money'. The defendant requested a new attorney . . . . The defendant had his *Marsden* requests denied twice. This failure by the defendant's attorney to consult and or call an expert to the stand on a legitimate defense, denied the defendant a fair trial, a right to present a defense and raises the issue of ineffectiveness of counsel. The defendant could have argued that he had a diminished capacity and probably in all reasonable likelihood, would have received a different result because evidence was deduced that the defendant was intoxicated and struggling with the victim and that is a defense to intent to kill murder. The defendant testified about the struggle with the victim and the gun. [Citation.] A new trial should be granted."

9

## B.

### *The Opposition*

The prosecution filed an opposition to the motion for a new trial which stated in relevant part:  "A review of the record clearly shows that [Atilano's trial counsel] was making a tactical decision when he did not call an expert on intoxication. . . .  The defense[']s theory was that the shooting was an accident or unintentional.  The primary witness to establish this defense was through the defendant's own testimony from his recollection of the incident.  If his attorney had called an expert on how alcohol affects the body and mind it would have countered the defendant's credibility and version of the events.  To argue for the lesser offense of voluntary manslaughter [Atilano's trial counsel] had to argue that his client's versions of the events were the most credible.  Thus, [Atilano's trial counsel] was not incompetent in failing to call an expert witness on how alcohol affects a person."

The prosecution further argued:  "In the instant case, even if the defense would have called an expert witness on voluntary intoxication that would not have resulted in a different result.  Here, the only witness that said he was intoxicated or consumed alcohol was the defendant.  [Citations.]  In addition, the defendant testified that even though he consumed alcohol he was fully aware of his actions.  [Citation.]  The evidence showed that the defendant was in an altercation with the victim prior to the shooting.  [Citation.]  The evidence also showed that [t]he defendant went into the parking lot area and at one point confronted the victim because he was talking to a Hispanic female and shot and killed him.  [Citation.]  The evidence also showed that after the shooting the defendant changed his clothing and fled from the scene.  [Citation.]  A review of the entire trial clearly shows that even if an expert witness on voluntary intoxication would have been called a different result would not have occurred."

10

## C.

### *The Trial Court's Ruling*

The trial court denied Atilano's motion for a new trial. At the hearing on the motion, the trial court explained the basis for its ruling: "There is the issue of the defendant's intoxication, possible intoxication, self-alleged intoxication. [The prosecutor] points out that that defense, raising those issues, would have run contrary to [defendant's trial counsel]'s approach to the case. And it would have taken away that which [defendant's trial counsel] was seeking to, if you will, sell to the jury of voluntary manslaughter. [¶] I am aware that a case can be reversed—and it happened to me as a D.A.—when the defense simply overlooked an issue that they could have raised that was not inconsistent with the defense that was being pursued in argument. That is not the case here. That would have been, in fact, inconsistent with what the defense was arguing. And in a situation where there is an inconsistency, I believe Defense attorney, in the exercise of his professional judgment, is entitled to make a decision. [¶] And we all know that arguing multiple conflicting theories in a case can be wholly counter-productive. And sometimes you just have to put your eggs in one basket and run with that and hope you made the right call. It appears to me that is what [defendant's trial counsel] did in this case. In hindsight, it didn't work. But you know, you can't go making decisions on that basis. Was he a reasonably competent attorney providing reasonably competent advice at the time that he made that decision? Yeah. So I find nothing I.A.C. about that. So the bottom line is at this point, I believe I intend to deny the motion for new trial."

## IV.

### THE RECORD SHOWS ATILANO'S TRIAL COUNSEL HAD A RATIONAL TACTICAL PURPOSE FOR NOT PURSUING EXPERT WITNESS TESTIMONY ON VOLUNTARY INTOXICATION.

In his appellate briefing, Atilano does not dispute that a reasonable attorney might, for tactical reasons, choose not to present conflicting defense theories at trial.

11

(See *People v. Jones* (1991) 53 Cal.3d 1115, 1138 ["The presentation of conflicting defenses is often tactically unwise because it tends to weaken counsel's credibility with the jury"]. He does not dispute that, based on his testimony, he argued in his defense at trial that he shot Greene by accident following a struggle with him for control of the gun.

Nor does Atilano challenge the trial court's statement at the hearing on the motion for a new trial that given his primary defense, the simultaneous pursuit of a voluntary intoxication defense through expert testimony might confuse the jury if not directly undermine the strength of that primary defense. If Atilano had been so intoxicated to have not actually formed a specific intent to kill or to have not actually premediated and deliberated Greene's killing, the jury might have deemed his testimony regarding the struggle with Greene for control of the gun to be not credible. Atilano's counsel chose the defense theory that if successful, would have likely resulted in Atilano being found guilty of no crime greater than manslaughter. Had the jury accepted the voluntary intoxication defense instead of the accidental shooting theory, Atilano might still have been found guilty of second degree murder.

On this record, we cannot say Atilano's trial counsel lacked a rational tactical reason to forego presenting expert testimony on voluntary intoxication. The trial court, therefore, reasonably ruled that Atilano's trial counsel's failure to present such expert testimony was insufficient to warrant granting a new trial.

In his opening brief, Atilano argues the trial court erred by failing to consider the declaration Atilano submitted in support of the motion. As relevant to the issue on appeal, Atilano's declaration stated: "[Atilano's trial counsel] and I discussed my drunkenness on the night of this incident. I told him and he agreed that we should call an expert witness. But [trial counsel] told me it was too late for that and he would just argue it to the jury. He also said that my parents could not afford an expert, so it was useless for him to contact one."

12

At the hearing on the motion, the trial court stated: "There was some discussion in particular[] in the declaration executed by Mr. Atilano pertaining to communications between Mr. Atilano and [his trial counsel]. That is outside the scope of the record. That is outside the record of the trial in this case. Maybe there is a gris[t] there for some sort of writ in this matter. But I do not believe that these are issues that are properly before the Court at this point. So I am simply not going to make any ruling on those. By not making any ruling, I am not granting a motion for new trial based upon those issues."

Any error by the trial court in failing to "rule" on the declaration or otherwise consider it was harmless because Atilano's declaration does not establish that his trial counsel lacked a rational tactical reason to forego pursuing expert testimony on voluntary intoxication at trial. The declaration does not show that trial counsel failed to identify and consider the voluntary intoxication defense nor does it purport to state all of the reasons Atilano's trial counsel chose not to pursue expert witness testimony on that defense. It does not show Atilano asked his counsel to provide all such reasons and that counsel refused to provide them.

The declaration is unclear at which stage of trial Atilano and his trial counsel had the described discussion or what counsel meant by it being "too late" to offer such evidence. Counsel's statement might have reflected his opinion that it was too late in the trial to interject a new and somewhat conflicting defense theory given the evidence that had already been presented to the jury by that point in time. Furthermore, the declaration does not foreclose the possibility that Atilano and his trial counsel had previously discussed pursuing such a defense but agreed to focus on the accidental shooting theory as Atilano's primary defense instead.

The trial court's denial of the motion for a new trial did not constitute a manifest and unmistakable abuse of its discretion. (*Hoyt, supra*, 8 Cal.5th at p. 957.)

13

DISPOSITION

The order denying Atilano's motion for a new trial is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.

14